I want to focus on two issues today, the discriminatory investigation leading to the denial of the task force assignment and then retaliation. The district court said that the complaint pled only in conclusive terms that there was discriminatory intent in the course of the investigation that led to the denial of the task force. It's not conclusive. The complaint says that the memo issued by Lieutenant Gaddy corroborates this because in the memo he talks about the process leading up to the investigation, which is that, so is the admission, which is that when they found out that Lieutenant Gaddy had recommended plaintiffs for this position, other members of the task force expressed concerns that that really reflected a stereotypical view of plaintiffs. Well, that's what I wanted to ask you about because it seems to me that there are actually specific incidents that they're referring to, not general stereotypes. They're basically saying he was on a video in which explicit language was used. He's depicted listening to rap music that involves explicit language in violation of a department policy. How are those stereotypes as opposed to specific incidents? They accused him of associating with gang members and convicted criminals, which is not true. They accused him— But didn't they point to specific incidents? But he refuted each and every one of those episodes, and he said in his rebuttal memo none of this is true. You know, the photographs that you're talking about have a very big review from a higher than they did something that took place in 2011 when I was about 17 years old, and you know, I don't have a matching tattoo of any gang members. I don't associate with criminals. And, you know, there's nothing wrong with listening to rap music. And, you know, the initial concern expressed by these officers was essentially he's not one of us. And let's face it. If these concerns were true and if they had already believed that these things were true, people would be working for the department. You can't have a police officer working for the police department running around with gang members and associating with criminals and matching tattoos. The gang members—none of this was true. And in the memo, in Lt. Gay's memo, which has a lot of revealing positions here, McGurk told Captain Gay corroboration is required to act on these concerns. This is a crime Lt. Hattie's over. And that's what they did. They conducted investigations without consulting with the plaintiff at all, asking about any of this. They reached these adverse findings about him that make him—it's true, not only unofficially to the task force, probably unofficially to the police department, but his rebuttal shows that none of this was true. So on a rules level, where we accept the plaintiff's allegations as true, we don't get into whether he was—on a rules level, we have to accept that the allegations in the complaint that he was denied a position for stereotypical reasons because his race is true. And, you know, the arguments that the defendants have raised in 312 and did violate the policy, that's just so ridiculous. You know, soliciting for abuse is not against the law, and it doesn't reflect negligence on a person's character. And I don't think on a rules level we can find that even though there's a video of him—he's playing in the background. He says that the background was his. That that's enough to sustain a rules level dismissal. So the discriminatory intent is not conclusive, as this report said. The discriminatory intent is reflected in the details of the complaint. And in the memo, page 81 and 82, the memo really tells us what was happening in the second paragraph, how they reacted when they found out that the plaintiff was on—in line with this task force. So there's a question about adverse action, whether denial of plaintiff's membership on the gag plan task force is an adverse action. Under Rule 12, at this stage of the case, it is. Well, I guess maybe there's more of a question of just causation. So, I mean, the allegations seem to be vague as to who made the decision and what the decision was based on. The— Maybe you can help me with that. The task force, sure. Well, certainly, Lt. Gay, who wrote the report, is the defendant. This is also a Title VII case, not just in 1983, but a little bit of individual liability under 1983. Captain Gay is one defendant. Deputy Chief Trudell is another because he ordered the investigation and he said, and we know based on what's in the complaint, the kind of language Trudell uses in private suggesting discriminatory intent. The officers who conducted the investigation identified in the complaint, it wasn't just Captain Gay who did the investigation, it was the other officers too. So accepting the allegations in the complaint was true. They endeavored to find their complainant, which wasn't true. They're liable as well for a discriminatory investigation that foreseeably led to the denial of plaintiff's placement on the gang violence task force. Adverse action. A couple of points I want to make about the adverse action. First, the complaint alleges, even though this didn't cost the plaintiff any salary, the loss of a prestigious position that has the potential to advance her career, that would be an adverse action. Counsel, the Supreme Court heard argument in a case called Muldrow. The question presented is, does Title VII prohibit discrimination in transfer decisions absent a separate court determination that the transfer decision caused a significant disadvantage? Does the answer to whether the denial of transfer is an adverse action depend on the outcome of that case? Yes. This court disagrees with me that denial to a prestigious position is an adverse action on the buyer versus Nassau putting that aside. So you would say we wouldn't need to wait for that because in your view it was a significant disadvantage. Correct. But if you disagree with that, if the plaintiff in Muldrow wins, but I think he won't because it would be a discriminatory, it would be equivalent of a transfer denial based on race. And I can't figure out what the Supreme Court would do, but it looks like the issue is relevant to our issue. Let me talk about the retaliation plan in this case. Again, Rule 12, under Title VII cases, you don't even really have to consider the consequences of the case, but you need to come close to the elements. You certainly can't protect an activity if you file a notice of claim, objecting to discriminatory culture and have the service police, you have the adverse action in the form of a reprimand, right, which took place a week earlier. And reprimands under this service case in Ontario and Malaya may qualify as adverse actions. And you have, well, you have Well, in this case the reprimand was just basically no action, right? It was just a warning that this is the policy of the department. And if you do it again, it will take more severe action, so that would make anyone think twice or dissuade them from speaking out against discrimination. So in your view, any warning is enough to constitute an adverse action. A reprimand, and this is a reprimand, and this Court has said reprimands may qualify as adverse actions. They may, but I think that they don't say that a reprimand that has no consequence, this is contemplating no further action at all, right? Unless he continues to listen to rap music and posts it on Facebook, then he will be subjected to more severe discipline and, you know, observability becomes more severe discipline. Well, it wasn't about rap music. It was about explicit language, right? Well, that and listening to music on a video. And, you know, none of that is illegal. It's under Rule 12. You can't sue that you violated the department policy based on what means is alleged or not in the reprimand. But the way I view this Court's case is a reprimand can be an adverse action. And it's too early of a case. Maybe for some, a judgment may explore what it means to be reprimanded by the department. But for now, under Rule 12, I think we make the claim that a reprimand like this is going to make somebody or dissuade somebody from speaking out again against discrimination in the department. The social media posts, in their brief, they say, well, the social media posts violated the policy on their face. I'm not so sure about that. You know, it is a complex balancing test this Court uses. Lucerto v. Giuliano, the law of duty of non-verbal and speech is entitled to significant personal protection. And then you have to analyze it carefully under the two or three-part balancing test. You can't really do that under Rule 12. You can on the summary judgment. Mr. Bergstein, earlier on, at the very beginning of your argument, you made a passing reference, if I'm not mistaken, to pages in the appendix 81 and 82. I have a bad habit of opening appendices. Not that your comment was inappropriate, but what exactly about these pages, what should I be looking at? Take a look at paragraphs on page 81, paragraphs 2, paragraphs 3 and 4, for that matter. Done by the task force personnel, that's the second line of paragraph 2, voice their concern, but I'm accepting the offer due to known associations with gang members and convicted criminals. They were fairly plain. There are no associations with gang members and convicted criminals. P.O. Hanks has a matching tattoo with a known gang member? Not true. He was present in a shop incident. There's a social media video of him in uniform listening to a rap song. You know, this tells you, this really frames the nature of the investigation that followed. Next paragraph, deputy chief of the court says, I acknowledge your concern that corroboration is required to act on these concerns and to decline the intended package offer. So that's what they did. Without even reaching these inflammatory allegations, that he was tagged in a Facebook page by a gang member, and the association of gang members, he wrote a rebuttal placing all this in context. He said, none of this, either all of this is false, or there's a lot more to the story than you're presenting in this memo. That's the memo about glossing the position on the task force. So, you know, in some ways, page 8182 is the most important document in the joint appendix. It really shows you what their thinking was. Discovery would involve, you know, what did you do to corroborate or disprove any of this? Did anybody speak to the plaintiff to see if it's true or to see if it's not true? And how exactly was he listening to rap music in a police car? Well, he wasn't in a police car. He was in a rented car. How does that violate department policy? And you can't decide these issues under rules well. So I don't think the allegations of discrimination are losing. Well, let me ask you. I'm just trying to understand the record, and I'm sure you'll help me. The word BRICK, B-R-I-C-K, comes up. It's a term of art that refers to drugs, right? I don't know if it's right. That's in their brief. I have no idea what that language means, and I don't think on the basis of the complaint, we can make conclusive research into what that language means. I think he was recording a rap video. You know, I recognize that rap music is wild. There are all kinds of music, by the way, that have been incorporated there, because I can assure you of that. And so to hit it on the plaintiff, because he's listening to that kind of music, there are all sorts of different kinds of music. It's not rap. So I don't know what BRICK means, but that's something to explore and discover. Can I ask you, do you understand that the word BRICK means this? And I don't know what the answer would be. Well, maybe opposing counsel will address this concern of mine. Let me ask you another part of the record. Where is your client's notice of claim? It is not in here. It is cited in the complaint, but it was not attached as an exhibit to the complaint, although there were many exhibits attached to the motion at the time. The right-to-sue letter is to be found at page 79. But I don't know. The notice of claim is not here, but it's summarized in the complaint. Okay. Yes, I can tell you that the notice of claim says it was intended as a discriminatory culture at the time. Thanks very much. Thank you. All right. You reserve three minutes for rebuttal. We'll now hear from Mr. Butler for six minutes and then Mr. Powers for six minutes. Good morning. Brian Butler, representative of the city of Syracuse, Kensington, Baltimore. Deputy Chief Richard Trudeau, Chief Joseph Cecil, and Deputy Chief Eric McCord. I would like to start with the imprints of discrimination. This report probably held that the complaint fails to allege any kind of claims that creates an inference of discrimination during the existence of a sufficiently severe or pervasive racial hostile working market. Mr. Counsel for the plaintiff said to this court that none of the concerns expressed in the memorandum at record pages 81 and 82 were true. That is an absolutely incorrect statement, and that can be shown through the rebuttal memo that starts at record page 125. The points in the Captain Gay memo at page 81 and 82 are all factual references of associations that the plaintiff had with known gang members. And in the rebuttal memo, the plaintiff acknowledged that. He actually said, Joe Brooks, who was a known Berktown gang member, they have a matching tattoo together, and he spent a whole page talking about how he had a relationship with Will Brooks all through high school. He grew up with him. He was friends with him. Can you ask just a record question? So was the rebuttal memo was appended to the complaint? The rebuttal memo was not. Well, yes, I believe it was. I think it was Exhibit 9 to the complaint. I believe it was Exhibit 9. Where did we find that? It's at 124. It starts at appendix 124 and goes through 129. So in that rebuttal memo, the plaintiff puts into context his association with known gang members, but that doesn't render the associations themselves untrue. That the references in that Captain Gay memo were accurate, and the plaintiff acknowledges those in his rebuttal memo. And that is why the court found that there is no inference of discrimination alleged in the complaint. Well, the principal basis, it seemed to me, for the complaint, and certainly on appeal, is that this is a stereotype case. And so I guess I'll ask you the same question that I asked Mr. Bergstein. Stereotype cases are generally about generalizations about a particular group that reveal animus. These seem to be particularized incidents that, if true, would be relevant. That's correct. And we have to put this into context with this 30-day temporary transfer to the gang violence task force. Clearly, his associations with gang members are relevant to this inquiry. And Judge, this is in a situation where the department said, plaintiff listens to rap music, therefore he must be associated with a gang. They were looking at specific instances of associations that the plaintiff had with these gang members. So it's not a stereotype. These are factual findings that the plaintiff rebutted in his rebuttal memo. He explained the context of them, but that doesn't mean that they're stereotypes. Nobody's a stereotype. There are no racial slurs at all alleged to have occurred in relation to this temporary transfer. Can I ask you about the gang affiliation? Sure. So your point is, because they're true, it's not plausible to say that it was based on a stereotype. And what you point to to show it's true is this Exhibit 9, which you've told me is an exhibit to the complaint, so we can look at it for purposes of a motion to dismiss. And there it says, well, it's true, but it's so long ago that they're just looking to something that doesn't bear on my affiliations now. I mean, at some point might that argument make the contention that they're looking to something that's stereotype-based plausible. If the rebuttal memo says I hung out in a certain neighborhood, that doesn't mean I'm affiliated now with gang members. Would there be a plausible inference at that point? In that, and just to add another thing, in that rebuttal memo, I think it references recent activity. For example, photographs with gang members that were posted on social media as well. So it's not just distant relationships. It was recent activity, recent social media posts that showed him at least having some relationship with gang members. But would you agree at some point that the rebuttal points could be sufficient to say, well, this allegation of affiliation is too far-fetched, too stretched, that we would say, okay, it's plausible then that this is being pointed to as pretext or the like. I don't agree with that in the context of this situation, which is the temporary assignment to the gang violence task force. His associations, whether they're present or whether they're in the past, are very relevant to that assignment for that temporary period to that task force. Those were identified as causes for concern. And clearly they are. And actually in their brief, I believe in their reply and in their opening memo, they expressed that without the context that the plaintiff gave in his rebuttal memo. They announced that would be cause for concern. So I do not believe that that would show any discriminatory animus for those causes to be expressed and, frankly, for a plaintiff to respond to those. With respect to the adverse action, and this wasn't addressed by the court in this decision, but this temporary transfer, 30-day temporary transfer, cannot be an adverse action under Second Circuit precedent. First, he doesn't explain anywhere how his current assignment in the gang violence precedent detail, which was another league task force, is any different than his temporary assignment in the gang violence task force. In addition, I think the key to this— Well, I mean, there was a suggestion that it's more prestigious, right? And that implies that it will have a positive impact, his membership in the task force. They do allege that, but they don't allege it as how that's any different than the prestigious task force that he was already assigned to. In addition, this— Well, he says more prestigious. Okay. And they do allege that, Judge. And this 30-day transfer is important and distinguishes this case from many of the other cases except for the Petrosino v. Bell organic case, which was a Second Circuit 2004 decision. In that case, the court talked about a temporary transfer and found that even with analogies that that could improve chances for advancement, that wasn't sufficient to constitute an adverse employment action. If we agree with you, then do we need to see what the Supreme Court says in Muldrow before concluding that the denial of transfer is not an adverse action? I don't believe so, because I think the standard is whether there would be a materially significant disadvantage to the worker. That's the question that the court's considering, whether that's required. So I'm not arguing, although it's a fact, that there would be no differential effect. The argument is that there is no material disadvantage from a denial, even if there was a denial, and that's in dispute. If there was a denial, then there was no material disadvantage to the plaintiff's work condition by his failure to participate on a 30-day rotation to the bank loan after. Finally, with respect to the retaliation claim, again, our position is, and the court properly held under the Burlington Northern standard, that there was no adverse employment action by the issuance of this written reprimand. I would refer the court to a more recent case that was issued after the briefing in this case, and that's Carr v. New York City Transit Inquiry 76F4172. In that case, this court reaffirmed the Burlington Northern standard with respect to adverse employment action in a retaliation case and concluded, with respect to the plaintiff in that case, that while the plaintiff argued that her diminished performance ratings, not having analysts report directly to her, being assigned to additional projects, and her supervisor's hostile tone in emails constitute unlawful retaliation, the court found that the alleged retaliatory actions were the result of generally applicable workplace policies. And the plaintiff has not produced evidence that these policies were applied to her or not. It's very similar to the situation in this case. The written reprimand was the result of an investigation that was already underway and resulted in a reprimand without any further action The evidence is in the record. The social media post very clearly violated the department's social media policy. So that fits very well within Carr v. New York City Transit Inquiry. And because there's no- And there are no allegations of discriminatory application in the complaint, of the policy. That's correct. That's correct. All right. Well, I think you're a little bit over. But we'll hear now from Mr. Powers for six minutes. Thank you, Your Honor. Good morning. I represent nine individual employees of the police department. They're called employees of Officer Hanks. None of them are in his chain of command for a relevant time period. The one party, individual party, I would note that I would like to focus on was Captain Day, Timothy Day. But I'd like to focus on the gay memo, which I think is appropriate. At the outset, relative to my other clients, I would note that at page two of the reply brief, Plaintiff indicates that he's abandoning his claims against three of my clients, Stu Izzo, Susan Izzo, Ian Clark, and Brandon Fugate. That leaves six, including Tim Gay. Relative to the other five, Hillman, Goodell, Thierry, Ness, and Howard, the sum of the allegations against those individuals is in two paragraphs of 192 paragraphs. That's paragraph 20 and 21 of the complaint. What is alleged is that these individuals violated the plaintiff's constitutional rights because they conspired with Captain Gay to investigate, to surveil him. And from the pleading and from the papers, we learned that this means that they collected social media and they handed it to Captain Gay. That is the sum of the allegations against those individuals. We have the case here in this district, Ciambrella v. County Nassau, which has been cited in many other decisions, which holds that a vague, conclusory allegation of conspiracy without individualized conduct identified in the details of the conspiracy identified in the pleadings is not sufficient to state a constitutional claim against individual defense. Captain Gay's conduct to the extent it could be argued to be a violation of the Constitution can't be attributed to these other individuals. We're just doing what we told them to, according to the pleadings, in collecting social media. Now, investigating an employee or an applicant for their social media is not an illegal act. It happens in every field, including the field of all the people in this room. It's not illegal, and it doesn't carry with it some inference of discriminatory antics. Now, the thing that we need to remember about Captain Gay now is context. Context is important, right? This is not an employer in some field referring to an applicant as being related to a gang or gang affiliate or the like in a field that's unrelated to gang members or gang affiliates. It is the very purpose of the Gang Violence Task Force to investigate gang violence and gang crime. And so what Captain Gay is doing—and I agree with counsel—one of the most important documents is the day memo. He's accurately reflecting information that he's been told or provided, and he's passing that on to his chief of hands, the chief's office. He's also giving them—this is important context—the social media posts that he's relying on. It's part of his memo. And he's letting the chief of command make the decision. He's not giving an up-or-down recommendation on the point of failure. He's saying we should be cautious about this. You should exercise, quote, justifiable caution. This is the supervisor of the Gang Violence Task Force. He says he's worried about the integrity of their investigations if one of their members has associations with known gang members. That is clearly a function of an individual's qualification and suitability for that position. It has no implied or otherwise reference to officer-attached race. Indeed, gang membership is not a race identifier. It's not a race identifier in the case law, and it's not a race identifier in the period. Gang membership transacts all races. And so this is a characteristic or qualification relative to this particular job. There can be no indentation of inference of racial discrimination just because an officer at the Gangs was observant that there appears to be some connection, both past connections or current connections, between this officer and these known gang members. And I'd like to address in more depth your question, Judge Nathan, about isn't there a potential at some point that these connections can be so stale that we can imply some sort of ulterior race coding in raising these concerns? So I want to draw your attention to the rebuttal now. And just for everybody's—this is the second most important document to review in the record. This is a—authored by the plaintiff. This is rebuttal to the gang I'm on, and it's provided to the department before they made any decision on the transfer and before they— And you agree this is part of the complaint, right? There's no dispute about that. It's attached to the complaint. It's referenced in the pleadings. Right. Okay. So what page are you referring us to? Okay. This is page 125 through 129. We're not going to read all that, so—I mean, we will read it. We have read it. But what are you referring to? Okay. So counsel says it's untrue that the plaintiff has an association with gang members even though he has an action attached to it. Page 1, this is page 126—or 125, excuse me. Photo 1 is a photo from 2011 with a former friend of mine, Will Brooks. The photo is shortly after we got matched and texted together, which states when we got into judgment. This is his words—plaintiff's words. He says, Brooks and I both attended an arrest together where we became good friends. He says, Will Brooks is a well-known, documented Bricktown gang member. He says, I have made arrests in my career of individuals in vehicles with Will Brooks. He also says, I have arrested other Bricktown gang members. So once the department gets this, it's worse for the plaintiff. Now, he argues this is a stale relationship in high school. You can imagine—you can imagine the supervisor of the juvenile justice task force who may have to execute a wiretap on the Bricktown gang member, on Mr. Brooks, may have to execute a warrant on Mr. Brooks, may have to call Officer Hanks as a witness to testify against Mr. Brooks. How even an old relationship—and he admits that they were in a relationship—but even an old relationship is a cause for concern. This is not code for race. And there's no plausible argument that it is. This is a legitimate concern that relates to his appointment. So let's talk about the other important part of the record. What are the actual social media posts? This is 156 and 157 on the record. These were provided with the memo. They were attached to the letter of recommendation. They are appropriate to consider as part of the record on Rule 12. And I'd like to focus on 157. This is a social media post from March 20, 2020. Okay, so this is not a scale of an old reference. This is less—this is about approximately less than eight months before the incidents in March. The line is, Brandon Hanks is with Waleek Betts. He's with him. Now, Waleek Betts—Brandon Hanks, we'll tell you, is a local member in the memo—is a prior member of the Boot Camp Gang. Now, Waleek Betts, you can also see in the record, was provided with this item for our brief, is a federally convicted RICO felon for gang-related activity. Okay, so that's one. Now, two, he states—this is the quote attributable to him. So this is Brandon Hanks in the picture. The hardest thing to do in life is to refrain from slapping the shit out of somebody that deserved multiple executions. Now, counsel argues, well, this is Mr. Hanks being punished for listening to that. Where in this post does it indicate that that's reference? Where is the attribution to the rap artist? Who is the rap artist? Where's the quotation marks? I read this. I don't see a rap there. I see a police officer saying something wildly inappropriate, gratuitously referring to violence against people in a public-facing, private, social media post. In addition, he's indicated in the caption that he's with a known convicted gang felon. And so it's not correct to say that there's no truth to the gay memo. You see, if you read that above memo carefully, everything that Captain Gay says in that memo is true. Now, Captain Gay doesn't just send the report. He sends the information to the chief's office. You make your own determination. Context matters. All right. Thank you, Mr. Powers. We'll now hear from Mr. Bergstein for three minutes of rebuttal. Context certainly does matter. Plaintiff's rebuttal puts everything in context. You mentioned you heard about Will Brooks. Plaintiff makes it clear he has nothing to do with Will Brooks anymore. They knew each other in high school. They went their separate ways. They have no contact anymore. He's a former friend from ten years ago when they were teenagers. You can't hold that against me today. They would have known this had they actually asked Brenton Hanks about this when they did the investigation, which they never did because it was a one-sided investigation. And I recall there was somebody investigating me. It wasn't the rebuttal prior to the determination not to transfer? I think it was. It's not clear when the rebuttal was written, but whether it was before or whether it was after, it doesn't hurt his case because it was before. I'm just responding to your argument just now that he wasn't given an opportunity to explain. No. And you attached to your complaint his explanation, which – I think he was given – I think somebody in the department gave him the game memo and said, Here, this is what they're saying about you, and Brenton took it upon himself to write a rebuttal. It wasn't part of a formal process where we want to hear your side of the story. Had someone not given the game memo to Brenton, there wouldn't be a rebuttal because he wouldn't have known about it. So it wasn't part of the process. But had they asked him, tell us more about Will Brooks, he would have said, I have nothing to do with him. And when he was cleared for the position – Well, wouldn't he have said, I have nothing to do with him anymore? Yes. Isn't that the point? Correct. The game memo says a known affiliation. You said that's not true. I think what you mean is he no longer has an affiliation, right? Right. The inference is he's still associated with the gang members, and he's not. And he spends a whole page explaining, I have nothing to do with this guy, and I have nothing to do with him. And this came up when he was cleared for the position in the first place. The department asked him about that association, and he was cleared for employment. Right, but there might be a difference between being cleared for employment and being selected for a gang unit. No. On the Rule 12, we're not conceding that he was associating with people that would make him ineligible for a gang membership task force. So on the face of this record, that's not a legitimate basis to hold it against him. So you don't think it would be relevant if some of the targets of a task force are people that a person knew pretty closely and had close relationships with in the past? That's irrelevant in your view? I imagine it could come up, but it doesn't make him ineligible to join the task force. This is all about efforts undertaken to make sure that Hanks doesn't join the task force. And what do we have on him? Oh, he hangs around gang members. He was in a photograph with a gang member. That's also in the record that we just heard about. He didn't know the guy in the photo was a member of a gang because it was a birthday party that Hanks went to, and he was posing with everybody. And somebody said, oh, by the way, somebody that he posed with is a member of a gang. He didn't know that. So why are we holding that against him? We heard about Wiley Betts. He explains his relationship with Betts. Betts has denounced all involvement with gang membership, and he runs a business, and the plaintiff supports people in Syracuse who run their own business in these disadvantaged communities. And I guess my point is this sounds like a summary judgment argument where we're looking at what are the consequences of this, what does it mean for that. This is a group as well. We all know, really, that he violated city policy by opposing what the plaintiff claims were back there in Syracuse. And as I mentioned earlier— No, but I guess the point is whether this supports and inferences discrimination. And so if the race of the person with these affiliations were different, your view is that this—what is the reason to think that there wouldn't have been a memo or there wouldn't have been concern about affiliations and conduct of the sort described in the memo? The plaintiff says members of the task force didn't want a claimant on the task force and diversified the members of the task force. Okay, that's a conclusory statement, right? That you don't get to rely on. But as much as we know, without discovery, is that they didn't want him on the task force, then he wouldn't have diversified the members of the task force. We know that Trudeau, who ordered the investigation, we know what kind of language he uses in some of the claims. He gave sworn testimony about racial language. So he was involved in all of this. So that helps us. You know, making continuous reference to associations with gang members, criminals, various references to rap music sounds like racial stereotyping to me. Without giving the plaintiff a chance to be heard, without giving him a chance to respond, and, you know, he does respond in a memo that is really accurate. He places everything in context. And this memo is certainly ripe for evaluation and discovery of a certain judgment. But I don't think we can say on Rule 12 that this memo looms his case because he admits that 10 years ago he was friends with somebody who ran an army. And the plaintiff has made clear in the complaint his commitment to law enforcement, his commitment to the community. He's not that person. But there's stereotyping him as somebody that he would never want on the task force. Okay. Well, we've gone way over, I think, for everyone. But look, we had questions, so that's why we go over. But we have certainly your briefs. We'll reserve decision. Thank you all for a well argued. Thank you.